## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

DONATO GALANTI, on Behalf of
Himself, and All Others Similarly Situated,

    Plaintiffs,

v.

THE GOODYEAR TIRE
& RUBBER CO.,
an Ohio Corporation,

    Defendant.



Civil Action No. 03-209
Honorable Stanley R. Chesler

*only*

4TH AMENDED Complaint

CHRISTOPHER DITLOW, on Behalf of
Himself and All Other Similarly Situated,

    Plaintiffs,

v.

THE GOODYEAR TIRE
& RUBBER CO.,
an Ohio Corporation,

    Defendant

Civil Action No. 03-5004
Honorable Stanley R. Chesler

**RECEIVED**

EJUN 1 0 2004

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

RONALD J. FRANK, on Behalf of
Himself and All Other Similarly Situated,

    Plaintiffs,

v.

THE GOODYEAR TIRE
& RUBBER CO.,
an Ohio Corporation,

    Defendant.

Civil Action No. 03-5924
Honorable Stanley R. Chesler

1

## FOURTH AMENDED AND CONSOLIDATED COMPLAINT

Plaintiffs Donato Galanti, Ronald J. Frank and Christopher Ditlow (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated throughout the United States, by their undersigned attorneys, allege upon personal knowledge as to themselves, and upon information and belief (based upon investigation of counsel) as to all other matters, as to which allegations Plaintiffs believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

### I. NATURE OF THE CASE

1)     Plaintiffs bring this class action complaint on behalf of themselves and all other similarly situated owners of radiant heating systems incorporating Goodyear's Entran II radiant heating hoses throughout the United States.  The class includes both residential and commercial owners of properties containing the Entran II hoses.

2)     Goodyear designed, manufactured, marketed and sold its Entran II hose as a special purpose rubberized hose specifically for use in radiant floor heating systems.

3)     Radiant floor heating systems have a hose or a pipe which is affixed in or under flooring or ceilings and connected to a heat source.  A fluid is heated and sent through the hose or pipe, thereby heating the floors and the structure itself.

4)     Radiant heating systems are also used for melting snow on driveways, walkways and roofs.

5)     Goodyear began manufacturing its Entran II hose in April 1989 and ceased production in 1993.  Goodyear sold over twenty-five million feet of the Entran II hose during this

2

6)    The hose, as designed by Goodyear, is defective.  The hose is defective because Goodyear used a material in the hose which oxidizes and loses plasticizer over a relatively short period of time.  The hose in a radiant heating system needs to be flexible, but the Entran II hose hardens resulting in leaks, cracks, and sediment build-up which eventually requires removal and/or replacement of the entire hose at a substantial cost to the consumer.

7)    Goodyear knew before and during the time it sold Entran II to the consuming public that Entran II was defective, not fit for use in radiant heating systems and unreasonably dangerous to the property of consumers.

8)    Goodyear is responsible and liable for, among other things, the costs of removing and replacing all of the Entran II radiant heating hose installed in the homes, offices, buildings and other structures of Plaintiffs and members of the proposed Class, and consequential damages, as a result of its defective Entran II hose.

## II. JURISDICTION AND VENUE

9)    This Court has jurisdiction over the parties in this civil action pursuant to 28 U.S.C. §1332 because of the parties complete diversity of citizenship and because the amount in controversy for each of the named Plaintiffs, as well as all proposed class members, exceeds $75,000.00 exclusive of interest and cost.  The amount in controversy exceeds $75,000.00 exclusive of interest and cost because, among other things, the class has an individual interest in obtaining injunctive relief that includes a comprehensive nationwide protection program which provides information to the class concerning repair and maintenance of Entran II, and a national inspection program.

10)    Goodyear transacts business and has offices in this District.  Venue is proper

3

pursuant to 28 U.S.C. §1391(a) because: 1) a substantial part of the events giving rise to this action occurred in this District; 2) a substantial part of the property that is subject of this action is located in this District; and 3) Goodyear is subject to personal jurisdiction of this Court.

## III.  THE PARTIES

11)     Plaintiff Donato Galanti is a resident of the State of New Jersey and owns a home in Point Pleasant, New Jersey  ("Galanti Property"). The Galanti Property contains a radiant heating system which utilizes Entran II hoses.

12)     Plaintiff Ronald J. Frank is a resident of the State of New York and owns a home and an office at 244 Houtman Road, Saugerties, New York ("Frank Property").  The Frank Property contains a radiant heating system which utilizes Entran II hoses.

13)     Plaintiff Christopher Ditlow is a resident of the Commonwealth of Pennsylvania and owns a home at 4220 Pakton Street, Harrisburg PA 17111, Pennsylvania ("Ditlow Property").  The Ditlow Property contains a radiant heating system which utilizes Entran II hoses.

14)     Defendant Goodyear Tire and Rubber Co. ("Goodyear") is an Ohio corporation with its principal place of business at 1144 East Market Street in Akron, Ohio.  Goodyear is authorized to transact business in the State of New Jersey and is currently doing so.  Goodyear, at all times relevant hereto, was engaged in the design, manufacture, marketing and sale of the Entran II hose that has been installed in numerous homes, offices, buildings, and other structures in the State of New Jersey and throughout the United States.

## IV.  CLASS ALLEGATIONS

15)     Plaintiffs seek to bring this case as a class action, under Federal Rule of Civil Procedure 23 et seq., on behalf of themselves and all others similarly situated in the United States

4

as members of the class, defined as follows:

> all Persons who own or owned Property in the United States in which Entran II hose, manufactured and sold by Goodyear, was or is used as a conduit for hydronic heating and/or snowmelting (the "U.S. Class"). Excluded from the Settlement Classes are Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, assigns and successors. Also excluded are the Judges to whom this case is assigned and any member of the Judges' immediate family. In addition, excluded from the Settlement Classes are (1) all Persons who timely and properly excluded themselves from the October 8, 2003 Agreement and who have not submitted a Request to Re-Join within the time frame set forth herein; (2) all Persons who, in accordance with the terms of Paragraph IX of the Amended Agreement, properly execute and timely file a Request for Exclusion with the Claims Administrator; and (3) the Plaintiffs in the following actions: *Sumerel v. The Goodyear Tire & Rubber Co.*, Case No. 02-CA-1997 (Colo. App.); *Loughridge v. The Goodyear Tire & Rubber Co.*, Civil Action No. 98-B-1302 (and consolidated cases) (D. Colo.); *Malek v. The Goodyear Tire & Rubber Co.*, Civil Action No. 02-B-1772 (D. Colo.); *Holmes v. The Goodyear Tire & Rubber Co.*, Case No. 02-CV-106 (Pitkin County, Colorado, Dist. Ct.); and *Vista v. The Goodyear Tire & Rubber Co.*, Civil

Action No. Case No. 02-CA-1690 (Colo. App.).

## NUMEROSITY

16)     The Entran II hose has harmed and continues to harm the homes, offices,

buildings and other structures in which it is installed throughout the United States.  The members

of the Class are so numerous that joinder of all members is impracticable.

17)     The exact numbers of Class members is unknown as such information is in the

exclusive control of Defendant.  However, due to the nature of the trade and commerce involved,

Plaintiffs believe the class consists of tens of thousands of consumers throughout the United

States, making joinder of class members impracticable.

## COMMON QUESTIONS OF LAW AND FACT

18)     Common questions of law and fact affect the right of each Class member and a

common relief by way of damages is sought for the Plaintiff Class members.

19)     The harm that the Entran II hose has caused or could cause is substantially

uniform with respect to Class members.  Common questions of law and fact that affect the Class

members include but are not limited to:

   a.     Whether the Defendant has sold a defective product in the stream of

          commerce;

   b.     Whether the Defendant has failed to prevent the damages occurring because of

          the defective product they designed, manufactured and sold into the stream of

          commerce;

   c.     Whether the Defendant has failed to warn consumers about the reasonably

          foreseeable dangers of using Entran II;

   d.     Whether the Defendant violated the New Jersey's Consumer Fraud Act (the

"Act"), N.J.S.A. 56:8-1*et. seq* or similar statutes in effect in other jurisdictions throughout the United States; and

e.     Whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

## TYPICALITY

20)   The claims and defenses of the Plaintiffs as representative Plaintiffs, are typical of the claims and defenses of the class.

## ADEQUACY OF REPRESENTATION

21)   Galanti, Frank and Ditlow, as the representative Plaintiffs, will fairly and adequately assert and protect the interests of the class:

a.     Galanti, Frank and Ditlow have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the class; and

b.     Galanti, Frank and Ditlow have no conflict of interest that will interfere with the maintenance of this class action.

## SUPERIORITY

22)   A class action provides a fair and efficient method for the adjudication of controversy for the following reasons:

a.     The common questions of law and fact set forth in Paragraph 19 predominate over any questions affecting only individual Class members;

b.     The class is so numerous as to make joinder impracticable.  However, the Class is not so numerous as to create manageability problems.  There are

7

no unusual legal or factual issues which would create manageability problems;

c.    Prosecution of a separate action by individual members of the Class would create a risk of inconsistent and varying adjudications against defendant when confronted with incompatible standards of conduct;

d.    Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests.

e.    Upon information and belief, defendant is responsible for the design and manufacture of defective Entran II hosing which was used in New Jersey, making this forum appropriate for the litigation of the claims of the entire Class; and

f.    The claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedure in which Class members can, as a practical matter, recover.  However, the claims of individual Class members are large enough to justify the expense and effort in maintaining a class action.

### COMMON EQUITABLE RELIEF

23)    Goodyear has acted or refused to act on grounds generally applicable to the Class by failing to provide adequate information or notice to the Class concerning the maintenance and repair of Entran II heating systems.  Therefore injunctive and declaratory relief is appropriate.

## V. COMMON FACTUAL ALLEGATIONS

24)     Radiant heating is a process by which thermal energy is transferred from one object to another. Heating systems relying on radiant heating transfer radiant energy through a hose which is installed underneath the floor. The radiant energy is transferred through the floor and into the objects that come into contact with the floor. Upon contact with the other surface, radiant energy is then turned into heat. Radiant heating transfers energy where it is needed, and never transmits heat to an object or a surface that is warmer than it is. The radiant heating system continuously equalizes the differences in temperature resulting in the temperature throughout the structure remaining constant. This results in a more efficient transfer of energy as well because radiant energy travels from one object to another without heating the space in between. Radiant energy only warms surfaces which are cooler than itself.

25)     In 1988, the Chiles Power Supply Company, d/b/a Heatway Radiant Floors and Snowmelting ("Heatway"), sold hoses for radiant heating systems manufactured by Dayco Rubber Products Company ("Dayco"). Heatway's owners, Daniel and Michael Chiles, concluded that the quality of Dayco's hose (the original "Entran") was not consistent. Heatway began discussing a joint venture with Goodyear in which Goodyear would design and manufacture a new hose (called "Entran II") exclusively for Heatway, and Heatway (with Goodyear's help) would market and sell the Entran II hose for use in radiant heating systems. At this time, the market for radiant heating systems was large and for the most part untapped. Heatway and Goodyear both expressed an interest in tapping this market. Goodyear eventually convinced Heatway that it had the skill and desire to design and manufacture a superior Entran hose.

26)     Goodyear, an industry leader in rubber technology for the past century, agreed to design and manufacture a top quality hose for Heatway. Heatway told Goodyear that it required a top quality hose that should be built to last indefinitely because "[l]ongevity is our greatest concern." Heatway also required a cover compound formulated to have excellent resistance to hydrocarbons and most common chemicals that may come into contact with the hose; degradation from sunlight; degradation from ozone; resistance to abrasion and jobsite abuse; and that it be able to resist intermittent elevated temperatures to about 300 F and continuous service to 200 F (See June 6, 1988 letter from Heatway to Goodyear attached as Exhibit A). Heatway concluded this letter by telling Goodyear that "[w]e want to offer better high temperature protection to our customers than they normally get from plastic pipe."

27)     Goodyear accepted Heatway's requirements. Describing its relationship with Heatway in a subsequently published article, Goodyear explained:

> Goodyear has teamed up with Heatway Systems to develop a unique subfloor heating system that's sending sales through the roof.... Together, Goodyear and Heatway have created a product that is successfully taking on world class competition in Europe... that's good news, and just another example of how Goodyear technology can work wonders even when partnered with the marketing skills and products of another company. Together, Heatway and Goodyear are bringing warm floors to cold feet everywhere.

(See Trial Transcript attached as Exhibit B).

28)     Despite its promise, Goodyear did not design and manufacture a hose fit for use in radiant heating systems. Goodyear's analysis of the radiator tubing it chose as a component to Entran II showed an unsettling reaction to heat and oxygen. Goodyear's Director of Hose & Grasp Development, E.F. Hodson, warned Goodyear executives in an internal Goodyear memorandum dated February 7, 1989 that: "we have little understanding

10

of the long term ageing [sic] and performance of hose in this application.... Let's not jump into this without thoroughly evaluating the business versus risk relationship." (See Memorandum attached as Exhibit C).

29)   A few months later, in an internal Goodyear memorandum dated May 1, 1989, Mr. Hodson continued to express his concerns about the Entran II hose to Goodyear executives. He stated in his memorandum:

> I am concerned about the proposals to supply single and twin line hose for this in-ground (embedded in concrete).... It seems that we have a reputable company involved in the business and their experience with the hoses they want is four years, with twenty-year guarantees. We have no way of forecasting the expected life. It seems to me there is a risk in this venture and one problem could negate years of profits. I am not going to sign off on this unless everyone else signs off knowing the possible problem. If it's decided we go ahead, perhaps a fund should be started to handle claims 10, 15 and 20 years ahead just like they have in the roofing business. I have told Dave not to issues specs to produce hose until we have discussed this fully.

(See Memorandum attached as Exhibit D).

30)   Goodyear's Development Manager, Dave Maguire, shared Mr. Hodson's concerns. In an April 28, 1989, memorandum Maguire warned Goodyear executives that: "[t]he biggest concern about this application is that the hose is expected to last 20 years minimum. Nitrile/neoprene has basically been used for only four years and with progressive hardening, problems may occur. Who is liable is of particular concern and needs to be resolved." (See Memorandum attached as Exhibit E).

31)   Without taking heed of Mr. Hodson's and Mr. Maguire's warnings, Goodyear completely by-passed the new-product testing and development phase and selected a nitrile rubber tubing for Entran II's interior lining. This resulted in the production of Entran II to begin

11

immediately, avoiding further development and testing costs, and leading to Goodyear's eventually reaping substantial profits from this industry.

32)     Goodyear began producing mass quantities of Entran II for Heatway at a significant profit. Heatway paid Goodyear sixty cents for every dollar of Entran II hose it sold. Goodycar eventually shipped out 25 million feet of the Entran II hose between April 1989 through the end of production in 1993. Entran II became so profitable that it became the single largest moneymaker for Goodyear's Mt. Pleasant plant.

33)     Problems began arising shortly after Goodyear's Entran II hose was installed in radiant heating systems across the country. The problems were related to Goodyear's defective Entran II hose. The problems manifested in a number of different ways including: leaks in the hose both at and away from the manifolds; clogging of the vent caps; a hard and brittle hose; build-up of a sludge-like substance in the circulatory pumps; high heating bills; cracked and weeping floor boards; and water or sludge damage to personal property in the home itself. Every problem was directly related to defects in the Entran II hose as designed and manufactured by Goodyear.

34)     To combat these growing problems, Goodyear began an internal campaign to shift blame and liability for the defective Entran II hose directly to Heatway. However, Goodyear did not disclose this campaign or its concerns about the serious problems with Entran II to Heatway. Instead, Goodycar wrote Heatway attempting to limit its warranty coverage, without disclosing to Heatway its true reasons for doing so. While engaged in these discussions Goodyear continued to promise Heatway that it had properly tested the Entran II hose, that Entran II was an excellent product, and that it was suitable for use in radiant heating systems.

35)    Heatway was reassured by Goodyear's promise that the Entran II hose would meet Heatway's longevity and design requirements.  Heatway was further assured because of Goodyear's reputation and its apparent commitment to designing and manufacturing quality products.  Heatway marketed the Entran II hose to consumers across the country as a product that could be expected to last indefinitely.  Heatway extended a twenty-year warranty to customers on all radiant heating systems using Entran II, further evidence of Heatway's conviction, based on its discussions with Goodyear that the Goodyear product would last indefinitely.

36)  For several years thereafter, Heatway continued to buy the defectively designed Entran II hose from Goodyear.  With Goodyear's support and direction Heatway continued to sell the Entran II hose to thousands of homeowners across the country.  Goodyear also continued to maximize its profits increasing the price of Entran II, leading both Heatway and consumers to believe the product was a safe, tested, long-lasting product.  Goodyear addressed this need to maximize profits in a letter to Heatway dated November 18, 1992, Goodyear told Heatway:

> Goodyear has supported Heatway's continued sales growth through the following.... Development of new products such as Entran II and Entran II... development and testing of variations of the above products.... Local sales support... Regional sales support... Marketing support.... Promotional support through our corporate organization... Goodyear has and will continue to support our partnership so that we can both enjoy continued growth.... However, profitability is also a necessity and this is why the 3% price increase is being implemented effective January 4th, 1993.

(See Letter attached as Exhibit F (emphasis added)).

37)    As Exhibit F shows, Goodyear participated heavily in the promotion, development, marketing, testing and sales of the Entran II hose. Among other things, Goodyear approved marketing materials knowing they included false statements about Entran II's longevity

13

and knowing that the materials would reach homeowners. Goodyear helped fund and participated in trade shows with Heatway to promote Entran II.

38)     Soon after the Entran II hose was sold across the country, customers started complaining to Heatway of problems with the hose. At this time the main problems were leaking because of a hardening and decaying of the hose. Heatway immediately relayed these complaints to Goodyear, and told Goodyear it believed the hose was defective. Goodyear refused to help Heatway confirm the problem. Heatway then undertook a comprehensive and detailed analysis of the Entran II hose to determine the exact nature and extent of the problem.

39)     Heatway paid a consultant, C.M. Roland, Ph.D., a chemist at the Naval Research Laboratory in Washington, D.C., to study the properties of the Entran II hose in 1997. Dr. Roland spent more than 600 hours performing experiments on the Entran II hose. Dr. Roland's results were that:

a.       The Entran II hose progressively hardens, even when used under the conditions Goodyear set forth for the use of the hose in radiant heating systems. The hardening occurred under all of the various testing conditions.

b.       At every circulatory temperature tested (temperatures ranging from 142 F to a high mean of 220 F) the thickness of Entran II's walls decreased. This loss occurred higher with a higher temperature, but it also occurred at temperatures below the norm.

c.       The composition of the fluid used in the system had a minimal effect on the rate or extent of the Entran II hardening.

d.        The hose did not need to be in direct contact with the fluid in order for the hardening to begin.  The hose demonstrated increased hardness when the fluid was in direct contact or when it was not in direct contact.

e.        The hardening is identical for the rubber on the outside of the hose as it is for the rubber on the inside of the Entran II hose, demonstrating that oxygen outside of the hose (i.e. atmospheric air) in combination with the large permeability of the hose, rather than oxygen trapped within the hose, is responsible for the thermal oxidative hardening as it permeates the hose.

40)     Dr. Roland further found that the hardening and loss of plasticizer in Goodyear's Entran II hose was easily predictable and was known by Goodyear when it sold the Entran II hose for use in radiant heating systems.  Goodyear scientists even authored reports in open literature, describing the susceptibility of the material used in Entran II to thermal oxidative hardening. Furthermore, Dr. Roland noted that Goodyear had at its disposal a variety of alternative rubbers and plasticizers when it was developing and testing the Entran II hose.  Dr. Roland stated that Goodyear knew some of these alternative rubbers and plasticizers were a superior product for high temperature usage.

41)     Goodyear's own test results on the Entran II hose support Dr. Roland's findings. For example, as mentioned earlier, Heatway told Goodyear that it required a hose to be able to withstand a continuous temperature of around 200 F with the possibility of the temperature reaching 300 F.  Goodyear tested Entran II at 180 F (well below the maximum temperature the hose was supposedly designed to sustain) and the results showed a substantial alteration in Entran II's properties in just one week.  More so, after eight weeks, the elongation of the hose to

15

the breaking point was reduced to almost half of its initial value. When the same test was run with a temperature of 212 F the elongation of the hose to the breaking point was reduced to almost zero.

42)     Although the Entran II hose has been tested and observed to harden and decay at different rates depending on the conditions of use, all of the Entran II hoses exhibit these defects over a relatively short period of time, regardless of how it was installed, how it was used, or how it was maintained.

43)     The Entran II hose that Goodyear designed, manufactured and sold was defective in design. Further, Goodyear failed to take reasonable steps to ensure that Entran II was fit for its known and foreseeable use.

44)     Under normal and reasonably expected use conditions, Goodyear's Entran II hose showed the following problems: a loss of mass, shrinking, brittleness or hardness, dimensional instability and cracking. The material that leaks from the Entran II hose not only damages the hose itself, but also the radiant heating system and the floors, walls, ceilings and other structural support of the consumer's home.

45)     Other types of plastic and rubber used in hoses across the country in radiant heating systems have not exhibited the problems that Goodyear's Entran II hose has exhibited.

46)     Goodyear did not provide a warning to consumers of the problems or dangers with Entran II. In fact, Goodyear concealed its knowledge of the defects and the potential defects of its Entran II hose from the public, and placed information about Entran II on its website indicating that hardening and leaks were the result of improper system design, installation or maintenance rather than an inherent problem with Entran II. It was not until the Entran II hose

16

was subject to media coverage; was the cause of hundreds of complaints and caused millions of dollars of damages that Goodyear put an announcement on its web page that the Entran II hose (called its "nitrile hose") was susceptible to accelerated aging.

47) Plaintiffs and the putative Class members were people Goodyear should have or could have reasonably expected to be adversely affected by the defective Entran II hose as a result of these consumers using the Entran II hose in a foreseeable way in their radiant heating systems.

48) Plaintiffs and the putative Class members have spent tens of thousands of dollars to have the Entran II hose installed in their homes and businesses.

49) In order to correct this problem, Plaintiffs and putative Class members have been, and will continue to be, required to spend tens of thousands of dollars to have the Entran II hose removed from their homes and businesses as well as to repair any damage caused by the leaking hose.

50) The cost of repair as well of resultant damage sustained by each of the Plaintiffs exceeds $75,000.00.

51) The cost of repair as well of resultant damage sustained by each Putative Class Member exceeds $75,000.00.

### COUNT I

### VIOLATION OF THE NEW JERSEY PRODUCT LIABILITY ACT
### (*N.J.S.A.* 2A: 58C-1 *et seq*)

52) Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

17

53)     At all times relevant to this Complaint, Goodyear was engaged in the design, manufacture, and sale of the Entran II hose.

54)     The Entran II hose was defectively designed.

55)     Because Goodyear defectively designed the Entran II hose, the Entran II hose was unreasonably dangerous to the Plaintiffs' property and to the proposed Class members' property at the time Goodyear sold the Entran II hose for its intended use in radiant heating systems.

56)     The defectively designed Entran II hose reached consumers without substantial and/or significant changes in the condition as Goodyear sold it.  Goodyear knew that Entran II would reach consumers without a substantial and/or significant change.

57)     The defective Entran II hose causes, among other damages and expense, water damage, structural damage and repair costs involved with ripping up and rebuilding floors and other parts of the home to replace the defective Entran II hose.

58)     At the time Goodyear was selling the Entran II hose, Goodyear was aware, or reasonably should have been aware, of the foreseeable risks associated with the use of its Entran II hose in radiant heating systems.

59)     Consumers using radiant heating systems with the Entran II hose were not aware of the dangerous nature of the Entran II hose.

60)     Goodyear failed to give adequate warnings or instructions to consumers about the reasonably foreseeable dangers that could result from using the Entran II hose under reasonably foreseeable conditions.

61)     When the Plaintiffs and the proposed Class members bought the Entran II hose, they were not aware of the dangerous and destructive nature of the hose.

62)     Due to Goodyear's failure to provide consumers with adequate warnings or instruction about the dangerous and destructive nature of the Entran II hose, Plaintiffs and the proposed Class members have been harmed.  Such harm would not have been suffered if Goodyear provided adequate warnings or instructions.

63)     Plaintiffs and the proposed Class members have suffered damages that were directly and proximately caused by the unreasonably dangerous and destructive Entran II hose, and have suffered damages because of Goodyear's failure to give adequate warnings or instructions regarding any reasonably foreseeable problems with the hose that could arise under reasonable foreseeable conditions of use.

64)     Due to Goodyear's defective design of the Entran II hose and its failure to give adequate warnings or instructions regarding any reasonably foreseeable problems with the hose that could arise under reasonable foreseeable conditions of use, Plaintiffs and the putative Class members have been, currently are and will be damaged in an amount to be determined at trial.

## COUNT II

### STRICT LIABILITY
### (Design Defect)

65)     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

66)     At all times relevant to this Complaint, Goodyear was engaged in the design, manufacture, and sale of the Entran II hose.

19

67)   The Entran II hose was defectively designed.

68)   Because Goodyear defectively designed the Entran II hose, the Entran II hose was unreasonably dangerous to the Plaintiffs' property and to the proposed Class members' property at the time Goodyear sold the Entran II hose for its intended use in radiant heating systems.

69)   The defectively designed Entran II hose reached consumers without substantial and/or significant changes in the condition as Goodyear sold it. Goodyear knew that Entran II would reach consumers without a substantial and/or significant change.

70)   The defective Entran II hose causes, among other damages and expense, water damage, structural damage and repair costs involved with ripping up and rebuilding floors and other parts of the home to replace the defective Entran II hose.

71)   Due to Goodyear's defective design of the Entran II hose, Plaintiffs and the putative Class members have been, currently are and will be damaged in an amount to be determined at trial.

## COUNT III

### NEGLIGENCE

72)   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

73)   Goodyear's Entran II hose was defectively designed and is unreasonably dangerous when used in radiant heating systems.

74)   At the time Goodyear was selling the Entran II hose, Goodyear was aware, or reasonably should have been aware, of the foreseeable risks associated with the use of its Entran II hose in radiant heating systems.

20

75) Goodyear had a duty to disclose to the consuming public the foreseeable risks associated with the use of its Entran II hose in radiant heating systems. Goodyear further had a duty not to put defective and dangerous products such as its Entran II hose on the market.

76) Goodyear breached its duties to the Plaintiffs and Class members by failing to disclose the known risks associated with its Entran II hose, and by allowing the sale and use of the Entran II hose when it knew it would not perform as intended.

77) As a result of the foregoing, the Plaintiffs and the proposed Class members have suffered damages that were directly and proximately caused by the unreasonably dangerous and destructive Entran II hose.

78) Plaintiffs and the proposed Class members are entitled to damages in an amount to be determined at trial.

## COUNT IV

### NEGLIGENCE
### (Failure to Warn)

79) Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

80) Goodyear's Entran II hose was defectively designed and is unreasonably dangerous when used in radiant heating systems.

81) At the time Goodyear was selling the Entran II hose, Goodyear was aware, or reasonably should have been aware, of the foreseeable risks associated with the use of its Entran II hose in radiant heating systems.

82) Consumers using radiant heating systems with the Entran II hose were not aware of the dangerous nature of the Entran II hose.

21

83) Goodyear failed to give adequate warnings or instructions to consumers about the reasonably foreseeable dangers that could result from using the Entran II hose under reasonably foreseeable conditions.

84) When the Plaintiffs and the proposed Class members bought the Entran II hose, they were not aware of the dangerous and destructive nature of the hose.

85) Due to Goodyear's failure to provide consumers with adequate warnings or instruction about the dangerous and destructive nature of the Entran II hose, Plaintiffs and the proposed Class members have been harmed. Such harm would not have been suffered if Goodyear provided adequate warnings or instructions.

86) Plaintiffs and the proposed Class members have suffered damages that were directly and proximately caused by the unreasonably dangerous and destructive Entran II hose, and have suffered damages because of Goodyear's failure to give adequate warnings or instructions regarding any reasonably foreseeable problems with the hose that could arise under reasonable foreseeable conditions of use.

87) Plaintiffs and the proposed Class members are entitled to damages in an amount to be determined at trial.

## COUNT V

## VIOLATION OF THE CONSUMER FRAUD ACT

88) Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

89) Goodyear is a merchant with respect to its sale of the Entran II hose.

90)     As stated previously, at the time it manufactured the Entran II hose, it was aware that the manufacturing process it was engaging in was not that which was required or expected by the consumer purchasing the hose.

91)     Specifically, Goodyear's Development Manager Dave Maguire and Director of Hose & Grasp Development, E.F. Hodson, were aware, and made everyone at Goodyear aware, that the process Goodyear was using to manufacture the Entran II hose showed an unsettling reaction to heat and oxygen.

92)     Goodyear was also aware that the general public expected the useful life of the hose to be at least 20 years and that Nitrile/neoprene had only been used for four years. Therefore, Goodyear had no way of knowing the actual useful life of the product.

93)     Despite this lack of knowledge concerning the process by which they were manufacturing the Entran II hose, Goodyear completely by-passed the new-product testing and development phase and selected a nitrile rubber tubing for Entran II's interior lining.

94)     Soon after it began to sell the Entran II hose the hose began to fail in properties across the United States.

95)     As shown in Exhibit F, Goodyear continued to participate in the promotion and advertising of the Entran II hose even after it became aware that the hose was failing in properties across the United States.

96)     Goodyear knowingly committed unfair and deceptive trade practices by designing, manufacturing, promoting, selling and marketing its defective Entran II hose to the consuming public knowing that the product was defective when sold.

23

97)     When Goodyear was designing, marketing, manufacturing, testing and selling Entran II, Goodyear knew or reasonably should have known that the Entran II hose was subject to failure when exposed to reasonably foreseeable conditions and under reasonably foreseeable uses, and therefore the Entran II hose was unreasonably dangerous for consumers to use as a radiant heating hose. Goodyear failed to inform the consuming public of any of these facts.

98)     At no time, did Goodyear take the reasonable steps to remedy the defects in the hose or try to ensure that the Entran II hose was otherwise fit for its intended use in radiant heating systems.

99)     Goodyear also failed to give adequate warnings regarding the use and potential problems with its Entran II hose.

100)    Defendant's actions complained of herein occurred and occur in the conduct of trade or commerce, and all of the conduct alleged herein occurs in the course of Defendant's business.

101)    Through their marketing, promoting and manufacturing of the Entran II hose, Goodyear intended to and did deceive consumers, by leading consumers to believe that the Entran II hose was a merchantable, viable and warrantable Goodyear product.

102)    By reason of the foregoing, Defendant's conduct represents unfair acts and/or practices that have the capacity to, has, and continues to deceive consumers.

103)    Goodyear's conduct constitutes an unfair and deceptive trade practice under the New Jersey Consumer Fraud Act or similar statutes in effect in other jurisdictions throughout the United States.

104)    As a direct and proximate result of these unfair and deceptive trade practices,

Plaintiffs and the members of the Class have been damaged as alleged herein, and are entitled to

recover actual and/or punitive damages to the extent permitted by law, including class action

rules, treble damages and attorneys fees in an amount to be proven at trial.

## COUNT VI

## PUNITIVE DAMAGES

105)    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

106)    Plaintiffs further alleges that the defendant, by virtue of its wrongful actions and

course of conduct set forth above, Goodyear has been guilty of a wanton and willful disregard of

the safety of consumers, who foreseeably could be and have been harmed by the defective Entran

II product.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray that the

Court:

1)    Declare, adjudge and decree that Defendant has committed the violations of state law

alleged herein;

2)    Determine that under Federal Rule of Civil Procedure 23 *et seq.*, this civil action may be

maintained as a class action, and certify it as such;

3)    Order that judgment is entered for Plaintiffs and the Class on their claims against

Goodyear on Counts I through VI above;

4)    Award Plaintiffs and the Class damages, as determined at trial, with interest;

5)    Award Plaintiffs and the Class damages based on Goodyear's violations of the New

Jersey Consumer Fraud Act or similar statutes in effect in other jurisdictions throughout the United States;

6)   Award Plaintiffs and the Class punitive damages pursuant to the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5., *et. seq.*, or similar statutes in effect in other jurisdictions throughout the United States, as determined at trial;

7)   Award Plaintiffs and the Class restitution for unjust enrichment and disgorgement of Goodyear's ill-gotten gains;

8)   Require Goodyear to establish a nationwide consumer protection program which will, among other things, provide class information concerning the maintenance and repair of Entran II heating system costs;

9)   Require Goodyear to establish a national periodic inspection program of Entran II systems.

10)   Award Plaintiffs and the Class their costs, including counsel and experts' fees, prejudgment interest and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by Jury on all issues so properly triable thereby.

**Respectfully submitted,**

**DATED:**    **June 4, 2004**

Harris L. Pogust, Esq.
SHERMAN, SILVERSTEIN, KOHL,
 ROSE & PODOLSKY,
4300 Haddonfield Road, Suite 311
Pennsauken, New Jersey 08109.
856-662-0700 Telephone

Jonathan W. Cuneo
Charles J. LaDuca
CUNEO WALDMAN & GILBERT, LLP
317 Massachusetts Ave.  NE
Suite 300
Washington, D.C. 20002
202-789-3960 Telephone

Arnold Levin, Esquire
Daniel C. Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
215-592-1500 Telephone

Gary E. Mason
Charles A. Schneider
THE MASON LAW FIRM
1225 19th St. NW  Suite 600
Washington, D.C. 20036
202-429-2290 Telephone

Elmer Robert Keach, III
LAW OFFICES OF ELMER ROBERT KEACH
Twenty Corporate Woods Boulevard
Albany, New York 12207
518-434-1718 Telephone

William Audet
Michael McShane
ALEXANDER HAWES & AUDET
300 Montgomery Street
Suite 400
San Francisco, California  94104
415-982-1776

Michael Flannery
THE DAVID DANIS LAW FIRM, P.C.
8235 Forsyth Boulevard
Suite 1100
St. Louis, Missouri  63105
314-725-7700

Alexander Barnett
THE DAVID DANIS LAW FIRM, P.C.
575 Madison Ave.
10th Floor
New York, New York 10022
212-605-0150

Attorneys for Plaintiffs.